In re Jane PUFFER, Martha Hoo, Rebecca Myers, Linda Crescenzi and Peter Manning, as they constitute the School Committee of the Town of Bedford, Plaintiffs,

v.

Harold J. RAYNOLDS, Commissioner of the Massachusetts Department of Education, and Lynne C., Defendants,

v.

Jane PUFFER, Martha Hoo, Rebecca Myers, Linda Crescenzi and Peter Manning, In Their Official and Individual Capacities, and Rory Liebman, Joan DiClemente, Joan De George–Schirmer, and Thomas Duggan, Individually and as Agents of the Bedford School Committee, Third–Party Defendants.

Civ. A. No. 87–1325–MA.

United States District Court, D. Massachusetts.

Sept. 15, 1988.

Opinion on Motion for Extension of Time Oct. 31, 1988.

Opinion on Motion for Final Judgment Dec. 27, 1988.

Opinion on Motion for Reconsideration Feb. 15, 1989.

Final Opinion June 26, 1990.

Robert G. Fraser, Stoneman, Chandler and Miller, Boston, Mass., for plaintiffs.

Joanne Fray, Lexington, Mass., for Lynne C.

Lisa A. Levy, Asst. Atty. Gen., Boston, Mass., for state defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

### I.

This is a case concerning the education of Lynne C. in the Bedford Public schools. At the end of the 1985–86 academic year, Lynne C., then a senior, was issued a high school diploma. She contends that the issuance of this diploma, and the events leading up to it, was a violation of her rights under federal and state law to obtain special education services in the public schools of the Commonwealth.

Lynne C. pursued state administrative remedies prior to the advent of this action, appealing first to the Bureau of Special Education Appeals ("BSEA") and from there to the State Advisory Commission for Special Education ("SAC"), eventually obtaining a decision that Bedford violated her rights, and ordering it to rescind the diploma issued to her, conduct an evaluation of her and provide whatever special educational services that were deemed appropriate.

On May 22, 1987, the Bedford School Committee filed this action attacking SAC's decision on a number of grounds. Harold Raynolds, the Commissioner of the Massachusetts Department of Education, filed his answer to the complaint on July 13, 1987. Lynne C. also answered on July 13, and filed counterclaims against the Bedford School Committee. On August 12, 1987, she filed a motion to amend her counterclaim by adding defendants, employees of the Bedford School System, which was allowed by this Court on September 9, 1987. The plaintiffs, the defendants in counterclaim, and the third-party defendants answered the amended counterclaim on September 24, 1987.

On April 28, 1988, the plaintiff school board and the third-party defendant employees of the Bedford School system, and the Commonwealth filed a joint motion to reinstate the decision of the BSEA and to set aside the decision of the SAC in this matter. On February 18, 1988, the plaintiffs and third-party defendants moved for summary judgment. On May 9, 1988, Lynne C. filed a motion in opposition to both the plaintiffs' and third-party defendants' motion for summary judgment and to the plaintiffs' and Commonwealth's joint motion to reinstate the decision of the BSEA. She also moved for summary judgment on her counterclaims.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). This Court is required to examine the relevant facts in the light most favorable to the non-movant, *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and indulge that party all appropriate inferences, *Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). At this stage, this Court must examine the evidence to determine if there exists a genuine issue concerning a fact material to the dispute that must be reserved for trial. "The inquiry performed is the threshold inquiry of deter-

mining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This standard requires a non-movant to offer "concrete evidence from which a reasonable juror could return a verdict in his favor," and not merely rely on the hope that the jury disbelieves the evidence offered in support of the motion. *Id.* at 256, 106 S.Ct. at 2514. To defeat the motion, the non-movant "need only present evidence from which a jury might return a verdict in his favor," *id.* at 257, 106 S.Ct. at 2514; "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*, at 249, 106 S.Ct. at 2511.

In this matter, Lynne C. has moved for summary judgment on her claims based on the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1415, the Rehabilitation Act, 29 U.S.C. § 794, the Civil Rights Statute, 42 U.S.C. § 1983, the state special education statute, ch. 71B of the Massachusetts General Laws, and the state Civil Rights Act, Mass.Gen.Laws Ann. ch. 12, § 11I. The Bedford School System parties have moved for summary judgment on their claim that the decision of the SAC should be invalidated, that the decision of the BSEA should be reinstated, and that Lynne C.'s counterclaims should be dismissed.

Since the issue of SAC's authority is solely one of law, it appears that the factual allegations alleged concern the summary judgment motion of Lynne C.; thus, the facts must be evaluated in the light most favorable to the Bedford School system parties.

## II.

Lynne C. was a student in the Bedford Public Schools from grade school through high school. She repeated the fourth grade during the 1977–78 school year, and received remedial Title I educational services in the fifth grade.

In March of 1981, Mrs. C. referred Lynne for a CORE evaluation pursuant to chapter 71B of the Massachusetts General Laws, also known as "Chapter 766." Bedford sought and gained Mrs. C.'s approval to conduct an "Educational Assessment" and an "Educational History" of Lynne. After the testing was complete, a meeting was held between Mrs. C. and three of Lynne's teachers. Three pages of handwritten, unsigned notes were made during this meeting which express the opinion that Lynne did not need special education services. Although it was standard practice to mail a copy of these notes to the parents, Mrs. C. does not recall receiving them. No formal "Finding of No Special Needs" was sent to Mrs. C.

On March 7, 1986, in the spring of Lynne's senior year in high school, Mrs. C. again requested that Bedford evaluate Lynne for special needs.[1] Mrs. C.'s consent was requested and was given for a "Psychological Evaluation" and "Achievement Testing" to be performed on Lynne. Mrs. C. was also given a form labelled "Team Evaluation Procedure and Information."

---

1. In her report, the Hearing Officer for the BSEA, Miriam Freedman, found that "[t]he parties dispute the reasons for this testing. Bedford maintains that it was to aid Lynne's application to Fitchburg State College's (Fitchburg) program for learning disabled children ... Mrs. C. maintains the testing was to provide special services for Lynne during the 1985–86 school year, as well as for her college application ... Mrs. C.'s March 7 request [for testing] includes the following passages:

    "Lynne has had difficulties with her studies all through high school. She puts a great deal of pressure on herself in order to maintain a passing grade ... This has been more evident this year than before ...
    Lynne has applied to Fitchburg ... If Lynne is tested and found to have a learning disability they would consider her enrolling ..."
    *Lynne C. v. Bedford Public Schools*, BSEA Decision No. 86–1315 (January 12, 1987), par. 6. However, the Hearing Officer did not decide which interpretation of Mrs. C.'s motives was the more accurate.

The educational and psychological tests were performed by Dr. Barbara Davis, psychologist for Bedford High School. The tests administered included the Bender Gestalt test, the California Psychological Inventory, the Rotter Incomplete Sentences Blank—High School Form, the Wechsler Adult Intelligence Scale–Revised, and the Wechsler Memory Scale. Dr. David also consulted with Lynne's teachers and reviewed her educational records. She reported her results under the heading "Intellectual Functioning" in a report written on March 21, 1986. Recommendations for special educational services were made on the basis of these evaluations.

After the assessments, Bedford did not submit a written Individualized Educational Plan (IEP) for Lynne's approval. However, the Bedford parties contend that they showed Lynne the special education services that would be offered to her, and that she decided that they would not be helpful. Bedford did, however, produce a "Student Conference Report", signed by Joan DiClemente, Team Chairperson, and Rory Liebman, Acting Director of Special Education.

On May 20, 1986, Mrs. C. requested, in writing, that Lynne's CORE evaluation be reopened. Mrs. C. also requested that Lynne be withdrawn from graduation so that she would be able to receive special education services. She added that Lynne would be evaluated by Dr. Eloise White, a clinical neuropsychologist. In a letter dated June 4, 1986, Thomas Duggan, principal of Bedford High, informed Mrs. C. that Lynne's diploma would be withheld. In a letter dated June 27, 1986, however, Mrs. C. was informed by Rory Liebman that Bedford would issue Lynne's diploma, effective June 5, the date of graduation. He also wrote that he would hold the diploma for at least 10 days to allow Mrs. C. to appeal the decision. Mrs. C. responded with a letter indicating that she would not accept the diploma, and requested a meeting with Liebman and Dr. White. At this point, Mrs. C. did not appeal the decision to issue the diploma.

In a letter dated July 3, 1986, Liebman informed Mrs. C. that a meeting would be held, but that it would not be a Team meeting and was independent of the diploma issue, adding that if Lynne's diploma was properly issued, her entitlement to special education services terminated on June 5th.

On July 16, Liebman offered a post graduate remedial program to Lynne C. On July 19th, Lynne's diploma was mailed to her.

On August 21st, Mrs. C. requested a hearing before the BSEA. The case was assigned to hearing officer Miriam Freedman, who heard evidence on October 21 and 29 and November 5. On January 12, 1987, Freedman issued her decision, finding against Lynne. Lynne appealed this decision to SAC. In April, 1987, Lynne received the Final Decision of SAC, overturning. the decision of the hearing officer, ordering Bedford to rescind the diploma, evaluate Lynne under the provisions of Chapter 766, and provide whatever special education services were deemed appropriate.

Lynne enrolled in Middlesex Community College in September, 1986.

### III.

Before going on to analyze the substantive claims made by Lynne C., it is necessary to examine the Bedford parties' challenge to the procedural administrative apparatus established by the Commonwealth to consider special education appeals, and to determine the weight, if any, the findings made in that process should have in this case.

### A.

■ The Bedford School Committee and defendant Harold Raynolds jointly moved that the decision of SAC be set aside, the decision of the BSEA be reinstated, and the appeal of Lynne C. from SAC be treated as a timely appeal to this Court from the decision of the BSEA, with the burden of proof on Lynne C. to demonstrate that she is entitled to relief. This conclusion flows, argue the movants, from an analysis of the statute and the regulations enforcing it. The statute states that whenever a com-

plaint is filed under section 1415(b)(1), "the parents or guardian shall have an opportunity for *an* impartial due process hearing which shall be conducted by the State educational agency *or* by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency." § 1415(b)(2) (emphasis added). Section 1415(c) provides review of that decision *only* if the hearing authorized above is conducted by a body other than the state agency; it reads "[i]f the hearing [described above] is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision ... may appeal to the State educational agency which shall conduct an impartial review of such hearing." *See also* 34 C.F.R. § 300.510 (1987) ("If the hearing is conducted by a public agency other than the State educational agency, any party aggrieved by the findings and decision in the hearing may appeal to the State educational agency"). Since the BSEA is such a state body, argue the movants, its decision should only have been appealable to this Court, not to SAC. In addition to other arguments made by the movants, they also cite a report prepared by the Office of Special Education Programs of the United States Department of Education entitled "Compliance Monitoring Report: 1986 Review of the Massachusetts State Department of Education", which found that the two-tiered review system for special education appeals in Massachusetts was inconsistent with the EHA, and ordered SAC to cease functioning as an appellate body.

Lynne C. argues that state law complied with federal law at the time of her appeal, and that the language of section 1415(c) should not be read to invalidate SAC as an appeals board. She cited Massachusetts regulations that hold that a BSEA decision is not final when it is appealed to SAC, 603 C.M.R. 28:410.0, and argues that the state and federal education agencies cannot retroactively overrule the law that existed at the time that Lynne C. made her appeal.

Although Lynne C. is correct in asserting that administrative orders promulgated by the federal government cannot dictate how this Court should rule in this case, it is nevertheless the responsibility of this Court to independently examine the state administrative structure followed here to determine whether it is in conformity with federal law. Where it violates the federal standard, this Court can and must invalidate it under the Supremacy Clause.

I find that the state practice of requiring a two-step appeal before filing in federal court violates federal law. Under section 1415(b)(2), a parent or guardian challenging a special education plan has the right to *"an* impartial due process hearing". Section 1415(c) allows appeal to the state only when the first hearing is not conducted by the state. In effect, then, the regulations allow the state to erect any administrative structure it chooses, but provides that, within that structure, the state itself will have only one opportunity to adjudicate the matter. Thus, the BSEA, established under ch. 15, § 1N, of the Massachusetts General Laws, and authorized to "provide for placement of children requiring special education into public schools or agency programs near their places of residence" under chapter 15, section 1M(18), is the only state body that should consider appeals. The decision of the BSEA was thus final under section 1415(e)(1), and appealable to this Court.

Invalidation of SAC's decision leaves this Court in an awkward procedural position, but not one without precedent. In *Muth v. Smith*, 646 F.Supp. 280 (E.D.Pa.1986), a case analogous to this one, the district court was presented with an identical challenge to state administrative procedures in which a two-tiered state level appellate process was utilized. The court invalidated the procedure, and held that since § 1415(e)(2) permits independent judicial review, the court would treat the appeal from the hearing officer's decision to the second level state administrative body as an appeal to the court "[i]n order to put this case in the same position it would have been in if the procedural flaws had not occurred." 646 F.Supp. at 286. Thus, the burden of proof was put on the party attacking the hearing officer's ruling. I find that the

decision in *Muth* states a logical approach to this problem. I thus reinstate the decision of the BSEA, with the burden on Lynne C. to establish that the hearing officer was incorrect in deciding that the errors made by Bedford were not "outcome determinative". *See Town of Burlington v. Dept. of Educ'n of Com. of Mass.*, 736 F.2d 773, 774 (1st Cir.1984) ("The burden of proof is on the party who seeks to overturn the findings and decision of the [state educational] agency"); *Tracey T. v. McDaniel*, 610 F.Supp. 947, 948 (D.Ga.1985).

### B.

■ The next issue to be decided is the weight to be given the hearing officer's decision in this matter. Under section 615(e)(2) of the EHA, section 1415(e)(2) of the codified version, a party aggrieved by the decision of the State educational agency after an appeal has been made to it can bring a civil action in federal district court. The statute continues:

> In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the Court deems appropriate.

Unlike an appeal from an administrative law judge, such as in the context of a social security benefits case, where substantial deference is to be accorded the decision of the administrative fact finder, the decision of the state appellate body established under the EHA is open to closer scrutiny. The review proceeding that a district court is expected to conduct is more extensive; "something short of a trial *de novo*." *Colin K. by John K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983), *quoted in Burlington*, at 790; *see also Age v. Bullitt County Public Schools*, 673 F.2d 141, 144 (6th Cir.1982) ("It is nonetheless evident that Congress intended the federal district court to make an independent determination of the appropriateness of the placement of the child ... The legislative history of the Act makes more apparent the intent of Congress that

the reviewing court is not required to defer to the findings of the administrative agencies," noting that language in the original version of the House bill requiring that the findings be deemed conclusive if supported by substantial evidence was rejected).

The First Circuit has recently examined the appropriate mode of review in these cases in *Burlington v. Department of Education*. In that case, the appeals court recognized that the district court "must make an independent ruling [in EHA appeals] based on the preponderance of the evidence, but the Act contemplates the source of the evidence will be the administrative hearing record, with some supplementation at trial." 736 F.2d at 790 (footnote omitted). The Court continued,

> Because Congress intended courts to make bounded, independent decisions— bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court— the question of the weight due the administrative findings of fact must be left to the discretion of the trial court. The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Id.* at 791–92.

The Supreme Court has also spoken to the issue of the power of the reviewing court in reexamining the decision reached by the administrative process under the EHA.

> Thus the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which

846

they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

*Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982).

Although the power of the federal court is thus broad, it is limited by a level of respect for the state proceedings. Indeed, the First Circuit highlighted this fact when it noted that "a corollary" to the rule it announced in *Burlington* was that where a state administrative body decides an issue based on state law, "a federal court should accord the findings deference." 736 F.2d at 792. The Court continued,

In such a situation ... a federal court continues to have the power of review on both federal and state grounds but should be more circumspect about its intrusion. It is hard to locate a significant federal interest in displacing a state agency's supportable ruling that one of its school systems has not complied with state standards. In turn, where a state agency holds an IEP to have met state standards, the federal court has a continuing obligation to ensure that the state standards themselves and as applied are not below federal minimums.

The decision of the hearing officer is thus accorded some deference in examining the issues presented in this case, although it is not of the controlling significance that decisions of ALJ's have in other contexts.

IV.

■ Lynne C.'s claims can roughly be grouped into three categories. First, she alleges violations of two federal statutes concerned with special education, the EHA, 20 U.S.C. § 1415, and the Rehabilitation Act, 29 U.S.C. § 794. Secondly, she makes claims under the Civil Rights Act, 42 U.S.C. § 1983, premised on violations of her rights under EHA, as well as violations of procedural rights guaranteed under § 1415, the Fourteenth Amendment, and Chapter 71B of Massachusetts law. Lastly, she alleges state law violations based on Chapter 71B and the Massachusetts Civil Rights Statute, chapter 12, § 11I. In order to facilitate discussion of the substantive issues, I will take up the § 1983 claims first. Lynne contends that the School Board members are answerable for the alleged constitutional violation through 42 U.S.C. § 1983 because they have direct responsibility for the underlying statutory violations alleged. Lynne has not, however, alleged facts demonstrating this direct responsibility. All that she has demonstrated is that her rights were allegedly abridged while certain individuals were sitting as the Bedford School Committee. The allegations made against these officials are similar to those made against city officials in *Williams v. City of Boston,* 784 F.2d 430, 434 (1st Cir.1986). In that case, a plaintiff brought claims against "policy making and supervisory official[s]". The First Circuit held that, to state a claim against supervisory or policy making officers, gross negligence to the point of recklessness of deliberate indifference in failing to establish a responsible policy must be alleged. Here, all that Lynne has alleged, in essence, is that the school board negligently failed to ensure that the prescribed policies were followed. Her claim thus fails on the merits.

Even assuming a valid § 1983 claim against members of the school board, they would still be protected by the doctrine of qualified immunity. *Schmidt v. Oakland Unified School District,* 662 F.2d 550, 553 (9th Cir.1981) ("School board members are entitled to a qualified immunity from money damages in section 1983 actions, for actions taken in good faith") (citation omitted). Under the standard for evaluating claims of qualified immunity erected in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), a plaintiff attempting to hold a state defendant liable in his individual capacity must demonstrate that a reasonable person in

the position of the defendant would have known that his conduct was in violation of clearly established constitutional rights of the plaintiff. Here, Lynne would have to demonstrate that the school board took some action that a reasonable person would have recognized as violating Lynne's rights. No such showing has been made.

Lynne C. also contends that the individual defendants are liable for issuing her a diploma allegedly in violation of her rights. She appears to concede, however, that the members of the school board could make use of precedent indicating that their good faith in doing so, and hence their immunity from suit under *Harlow,* was preserved because they sought out and followed the advice of counsel in taking the actions they did. *See Schmidt,* 662 F.2d at 554; *Okeson v. Tolley School District No. 25,* 766 F.2d 378, 379 (8th Cir.1985). I find this authority persuasive; it supports my conclusion that the school board members are not individually liable in this action.

█ Lynne C. also asserts a claim against members of the school board in their official capacity, that is, against the school board itself. As a local government body, the school board does not enjoy a qualified immunity from suit. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Nevertheless, Lynne C. must still demonstrate the Board's substantive liability to recover under § 1983.

Here she has failed to do so. She has made no demonstration of how the Board, in promulgating official policies and procedures and exercising supervision over their enforcement, violated her rights. The policies followed here as an official matter are those established by the state. There is no argument that they are unconstitutional, nor do I think such an argument if made, would succeed. All that Lynne C. alleges is that each of the defendants has failed to fulfill their responsibility to ensure that each child referred for an evaluation receive the appropriate testing and inform the parents of the child of their rights. The failure to fulfill these tasks simply does not amount to a constitutional wrong

actionable under § 1983. I thus dismiss the claim brought against the school board itself.

█ Lynne also makes claims against the employees and agents of the school committee, such as the Team members and staff at Bedford High. Lynne's argument, in essence, is that the failure of the Bedford High staff to provide her with written documentation of her special needs status as required under state law violated her rights to make use of the administrative machinery established to adjudicate special needs claims. The Bedford parties' response is that the special education that would have been offered to Lynne was rejected by her, making the failure to produce a written IEP of no consequence, an empty formality.

This part of Lynne C.'s § 1983 claim is based on violations of § 1415. It is established, however, that not all claims based on the EHA are actionable through § 1983. In *Smith v. Robinson,* 468 U.S. 992, 1008 n. 11, 104 S.Ct. 3457, 3466 n. 11, 82 L.Ed.2d 746 (1984), the Supreme Court noted that "[c]ourts generally agree that the EHA may not be claimed as the basis of a § 1983 action" (citations omitted). However, the Court went on to examine alleged wrongs under the equal protection and due process clauses that were "virtually identical" to the claims brought under the EHA. "The question to be asked, therefore, is whether Congress intended that the EHA be the exclusive avenue through which a plaintiff may assert those claims." 468 U.S. at 1009, 104 S.Ct. at 3467. The Court held that a due process challenge could be brought through § 1983 which would not be inconsistent with the EHA if a plaintiff must "resort to judicial relief to force the agencies to provide them the process they were constitutionally due." 468 U.S. at 1015 n. 17, 104 S.Ct. at 3469 n. 17. *See also Quackenbush v. Johnson City School District,* 716 F.2d 141, at 148 (2d Cir.1983).

The Court in *Smith* did not sanction the use of due process claims brought through § 1983 to supplement EHA claims, but suggested that, in order to spur the administrative process on, such claims may be cog-

nizable. In this matter, then, Lynne C.'s claim presents something of a problem. She has not asked for the administrative process to be opened for her; on the contrary, she made full use of the administrative procedure created under Chapter 766 to argue that the failure of the school board to provide her with a written IEP or finding of no special needs interfered with her rights. The question presented here is whether that failure constitutes a violation of due process; that is, was Lynne C. deprived of a property or liberty right without due process of law?

I find that, on the face of this record, it is not clear whether or not Lynne can show that she suffered any damage by the violation of the procedures established under Chapter 766 and section 1415. She may or may not have acted upon a written explanation of the findings of the Team and the recommendations for special education, as well as the explanation of her procedural rights, had such a written explanation been offered to her. The hearing officer concluded, after hearing testimony on this subject, that she would not have. Despite the deference that should be accorded this conclusion of the hearing officer, I am less inclined to be as sanguine as she in overlooking violations of a very detailed state statute whose requirements are clear and precise.

Even if liability could be founded upon this procedural violation, a subject I return to below, I nevertheless find that the defendants here would be entitled to raise the defense of qualified immunity. Under the facts alleged here, Lynne C. has made a case that a reasonable person would have recognized that Lynne C.'s statutory rights were violated by not issuing an IEP. However, considering the circumstances of this case, including Lynne's rejection of the service that would have been offered to her had the IEP been drawn up, and mindful of the hearing officer's conclusion that the failure of the school official to comply with these procedures was not outcome determinative, I find that a reasonable person would not have concluded that his or her actions constituted a constitutional violation. Thus, even if a § 1983 claim could be

brought against these defendants, I find them immune from suit.

The same conclusion must be reached with regard to the claim that issuing the diploma should be actionable through § 1983. Not only did the school staff have substantive reasons for issuing the diploma (i.e., that Lynne had satisfactorily passed all of her classes), but they had obtained legal counsel on the issue and acted according to it. The good faith of these parties, then, was preserved. Although Lynne may have a statutory claim for these alleged violations of her rights, they do not sound in § 1983.

## V.

I now consider what is the crux of this case, the statutory violations alleged by Lynne C.

Section 1415 provides the general federal framework within which states receiving federal funds under the EHA must operate. § 1415(a). Section 1415(b)(1) outlines some of the procedures required under federal law. It states that "[t]he procedures required by this section shall include, but shall not be limited to—

(c) written prior notice to the parents or guardians of the child whenever such agency or unit—

(i) proposes to initiate or change, or

(ii) refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child...."

Lynne C. contends that this section was violated.

In *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051, the Supreme Court outlined the approach a district court should follow in reviewing an agency decision pursuant to section 1415(e)(2). It directed district courts to first determine whether the state complied with the procedures mandated under the Act, and then to ascertain if the IEP developed was "reasonably calculated to enable the child to receive educational benefits". 458 U.S. at 207, 102 S.Ct. at 3051 (footnotes omitted). The standards

applicable here were promulgated pursuant to § 1415's broad outlines. In Massachusetts, the special education statute, chapter 766 (chapter 71B of the Massachusetts General Laws) and the regulations passed under it provide the specific standards to be followed here. Such standards are enforceable in federal court. *Burlington,* 736 F.2d at 788–89 (in determining "whether state substantive standards which guarantee a higher level of educational quality and benefits for disabled children than the federal minimum will be given effect in federal court," the court ruled that "[w]hile the federal Act establishes a basic floor of education, it may provide a lesser standard of educational services and procedural protection than state law mandates … We hold, therefore, that the Act incorporates by reference State standards, be they substantive or procedural, that exceed the federal basic floor of meaningful educational opportunity") (footnotes omitted).

Lynne C.'s argument that the regulations passed under chapter 71B were violated is well founded. Under the regulations, Mrs. C. was entitled to notice prior to the performance of the evaluation on Lynne. 608 C.M.R. § 28.317. Under § 322, the Team evaluating a student and the Administrator of special education are required to write an I.E.P. for each child in need of special education. In 1986, after her evaluation, Lynne was a child in need of special education, but no IEP was prepared. Section 324 further requires that

> No later than ten days after the TEAM and the Administrator of Special Education complete the evaluation and IEP, or make a finding of no need for special education, the school committee shall send to the parents of the child two copies of the IEP (or statement that the child does not need special education), one copy of which the parents may keep.

The regulation goes on to specify the contents of the notice that is to be sent. Neither in 1981 nor in 1986 was any such IEP

or statement of no need for special education sent to Mrs. C.[2]

The hearing officer found that no violation of Lynne's procedural or substantive rights occurred in 1981. After testing Lynne, Bedford told Mrs. C. of the procedures that would then be used, and her rights to appeal the decision. They also informed her that Lynne was not in need of special education. The hearing officer concluded that the lack of a formal finding of no special needs was not a violation of the regulations which demand that some statement be sent from the school committee to the parent regarding this finding. Such a statement, ruled the hearing officer, was made to Mrs. C. at the Evaluation Team Meeting, which involved Mrs. C., and was made in the notes taken at this meeting which were apparently sent home to Mrs. C.

I am not in agreement with this assessment. First, as to the issue of the weight of this finding, I find that the hearing officers' decision on this point is entitled to lesser deference than some of the fact-based issues. This decision is clearly one of law, the issue being the legal import that Bedford's actions are to have in this matter. Secondly, on the merits, I find that the detailed procedures of the state regulations here should not be so lightly cast aside. One of the great contributions of the state and federal statutes in this area is the clarification of rights with detailed statutory procedures. Bedford's substitution of these procedures with informal, less rigorous standards runs counter to the thrust of the statute. I thus find that Bedford's actions in 1981 were a violation of the state regulations and thereby of federal law.

■ The hearing officer reached a different result with respect to the 1986 procedure, finding that Lynne's rights were violated. After the evaluations of Lynne were conducted, the hearing officer noted that

---

**2.** Lynne also argues that § 324.0–324.4 was violated because no psychological testing was performed in 1986. However, since I am to view the facts most favorably to the Bedford parties, and since they allege that such testing was performed, I reject Lynne C.'s claim for the purpose of this motion.

Bedford did not create an IEP. I find this is a violation of the Regulations ... While there is persuasive evidence that Bedford was justified in believing the parent and Lynne were not seeking services, that judgment was not theirs to make. It is up to Bedford to create an IEP or to make a statement of no special needs. Then, it is up to the parent or Lynne to accept or reject these services. Bedford's "Student Conference Report" is an unacceptable substitute for its procedural violation.[3]

The hearing officer found, however, that this failing was not "outcome determinative." As she stated,

Lynne was, in fact, offered the services Bedford proposed for her. Ms. DiClemente testified that, had an IEP been written, it would have contained similar services. I find the services offered were consistent with the evaluations conducted by Bedford (and later by Dr. White). Lynne acknowledged that she knew of the services offered. She observed the proposed class and determined that it would not be helpful to her. There is no evidence at all that, if similar supportive services had been offered in written form on an IEP, Lynne would have accepted them.

*Lynne C. v. Bedford,* at 8–9.

The hearing officer also rejected Mrs. C.'s argument that without a written IEP, she was unable to appeal; "I find no basis for this argument. Any aspect of an IEP (including a noncompliance in not writing one) can be appealed by a parent. I note that when Mrs. C. filed her appeal in August, 1986, there still was no written IEP for Lynne!" *Id.* at 9.

Lastly, the hearing officer noted that even had Mrs. C. appealed, the services offered to Lynne would have been deemed appropriate. "They implemented the writ-

ten recommendations in reports of three evaluators." *Id.* at 9. She concluded,

Thus, in this case, the procedural noncompliance is not outcome determinative. Services offered to Lynne (albeit in an irregular fashion) were appropriate to her needs. She acknowledged receiving them and rejecting them at the time. If Mrs. C. sought to appeal Bedford's lack of an IEP, she could have done so before Lynne's graduation, as well as she did after the graduation.

Having found the above, this case presents a compelling picture of a young woman whose best interest[s] may not have been served by Bedford ... However, having raised these issues, it is critical to note that they concern Bedford's graduation standards ... If Lynne was underserved in Bedford, those concerns are for the Bedford School Committee to handle. It is not special education's role to patch up the cracks of Bedford's regular high school standards.

*Id.* at 9–10.[4]

I find that the hearing officer's decision, as it is primarily a decision of law, is not entitled to great deference. This is true even though it constitutes the decision of a state adjudicator on the issue of whether state standards were met in a particular case, an issue which the First Circuit has indicated that a federal court has little cause to interfere. However, in this matter, I am not faced with a case in which a state hearing officer has found that an IEP created under proper procedures comports with both state and federal standards. Instead, I am faced with a highly unusual case in which proper procedures were not followed, and the issue is one where the state in not promulgating an IEP may have ill-served a student. In these circumstances, I find that my role is to ensure that the dictates of the state procedure,

---

**3.** It is unclear to me why the hearing officer is unwilling to forgive the procedural violation here, despite the extra steps taken by Bedford, but willing to overlook similar infractions of the regulations in 1981. It appears that the hearing officer was more concerned that similar *results* were reached by Bedford's process than similar procedures followed.

**4.** Even though I have found that SAC is without authority to review the decisions of the BSEA, it is instructive to note the ground relied upon by it in rejecting the hearing officer's decision, that the failure to follow prescribed procedures in this matter was outcome determinative.

passed pursuant to federal law, comport with the protection of the rights of students to special education.

I am not as unconcerned with procedure as the hearing officer is here. Merely because the same result may—or may not—have been reached *had* proper procedures been followed is not determinative of this case. There are some independent values served by following proper procedures—i.e., the creating of a clear administrative record, the provision of notice of procedural options, etc. Although I think, as a practical matter, the hearing officer's decision is plausible, the failure of the school personnel to follow the clear command of state regulations cannot be so lightly excused. I thus reject the finding that these infractions were not "outcome determinative." *See Quackenbush*, 716 F.2d at 147 ("Particularly in a statutory scheme such as the EHA where great emphasis is placed upon procedural safeguards, we must assume that Congress intended some kind of relief when ... a handicapped child is deprived of the procedural safeguards granted by § 1415").

■ Lynne also argues that her rights under § 327 were also violated. That section reads,

Between the time that a child is referred for an evaluation and the time that a placement for the child is agreed upon, ordered, or otherwise required pursuant to these regulations and consented to by the parent, the child shall remain in his or her current educational placement.

Lynne's argument based on this section is that graduating her should be considered a change in placement which interfered with an ongoing appellate process with regard to Lynne's special education. As she asserted, "[i]f a child is in or has begun the special education process, the school department must abide by the procedural protections and continue to provide the current educational program until the appeals process is concluded or the school department has obtained a court order allowing it to change that educational program."

The hearing officer found that Lynne's diploma was validly issued; she had attended the regular education program and had passed all her courses without any special education assistance. Therefore, the hearing officer, reasoning backwards, found that Lynne was not a "child in need of special education services" as defined in chapter 71B and § 1415. Chapter 71B defines a school aged child as "any person of ages three through twenty-one who has not attained a high school diploma or its equivalent." She went on to conclude that graduation was not a change in placement because Lynne had never been formally found to be in need of services and indeed had graduated without receiving any.

I agree with the hearing officer that the diploma was validly issued. On this issue the hearing officer is interpreting state regulations and I cannot find that she has failed to do so properly. However, the administrative record reflects that in 1986 the Team members did find Lynne to be in need of special education services and recommended those services although not in the manner which would have begun the formal special education process. These two findings, a valid diploma and a procedurally defective attempt at special education services are not entirely inconsistent; Lynne succeeded despite Bedford's failure to follow the regulations for serving children in need of special education. She earned a valid diploma but that does not mean that she did not need services or that Bedford's failure to follow the proper procedures under the EHA and chapter 71B were immaterial to her education.

■ Before going on to discuss the relief appropriate in this case, two other issues must be addressed. First is Lynne's claim under the Rehabilitation Act, 29 U.S.C. § 794. That section states that no handicapped child will be denied participation in federally funded programs. The Bedford parties argue that Lynne is not handicapped, and that no allegation is made that comports with the definition of handicap under 29 U.S.C. § 706(8)(B)—that Lynne has a mental impairment which substantially limits one or more major life functions. They argue that even if Lynne's learning disability be considered an impairment,

there are no factual allegations that Lynne's major life functions have been curtailed. Indeed, they assert that the fact that she has passed her courses without special education, has been employed, and has attended college, suggests none of her life functions have been impaired. Lynne argues, on the other hand, that she is handicapped—that her disability impairs her ability to organize and effectively utilize new material. Thus, she contends, she cannot learn, retain or integrate new material meaningfully, and cannot build on previously presented information. Her rights were thus violated when she was denied the right to participate in special education programs.

I find that Lynne is handicapped under the statute. Under 29 C.F.R. § 1913.702(c), promulgated under the statute, major life activities is defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, *learning*, and working." (emphasis added). I find that since Lynne is impaired in her learning, she is handicapped under this definition. The allegations made by Lynne satisfy this definition.

I find, however, that there is some question as to whether Lynne can argue that this section was violated because she was not allowed to participate in special education programs. Under the facts of this case, special education *was* offered to her, just not in the proper way under the state regulations. I thus find that although she is handicapped, and although *another* law was broken in the way special education was presented to her, the Rehabilitation Act was not violated. Lynne was shown the classes that were recommended to her and she rejected them. Whether the method of presenting this offer violated the EHA and relevant state statutes is irrelevant to the issue of whether these benefits were denied her under the Rehabilitation Act. I find that they were not.

Lastly, Lynne makes a claim under the state civil rights statute, chapter 12, § 11I of the Massachusetts General Laws. That section authorizes an action for any violation of state or federal guarantees where such rights have been interfered with under § 11H. To prevail under this section, Lynne must demonstrate, first, that her exercise or enjoyment of rights under the constitution or laws of the United States or the Commonwealth has been interfered with or there has been an attempt to interfere with them, and, second, this interference or attempted interference was by threat, intimidation or coercion. *See* §§ 11H, 11I; *Redgrave v. Boston Symphony Orchestra* 399 Mass. 93, 502 N.E.2d 1375 (1987).

The Bedford parties argue that Lynne's claim fails because there are no allegations of any threats, coercion or intimidation made to Lynne. Lynne responds that there was coercion in that the Bedford parties failed to accord her substantive and procedural rights, and forced her to graduate against her will and without the benefit of an appropriate education.

I find that Lynne's argument with respect to the alleged coercion fails on its merits. The essence of coercion, intimidation or threat is to influence an individual to make a choice he or she otherwise would not have made. The case presented here is not one where the Bedford parties took actions designed to force Lynne to make a particular choice. The case presented here is like that which faced the Supreme Judicial Court in *Pheasant Ridge Associates Limited Partnership v. Burlington*, 399 Mass. 771, 506 N.E.2d 1152 (1987). In that case, a board of selectmen voted to take property by eminent domain while an application from the plaintiff for a comprehensive permit to develop the land was pending in the court of appeals. In reversing the lower court's finding that the wrongful taking was a coercive act, the Supreme Judicial Court held that

> [a]lthough the purported taking of the plaintiff's property was unlawful because done in bad faith, the taking did not itself interfere or attempt to interfere with the plaintiff's rights by coercion. The taking was an attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not to do anything.

399 Mass. at 781, 506 N.E.2d 1152. Like the situation in *Pheasant Ridge*, the steps taken here by the school board were not designed, and did not have the effect, of forcing Lynne to do anything. Granted, the failure to produce an IEP may have violated the procedural rules, the steps taken to make special education available to Lynne, even though not in comport with state law, indicate that the Bedford parties were not trying to prevent her from taking advantage of the services that were available. I thus find no coercion in what the Bedford parties did in this case.

## VI.

■ Having found that Lynne C.'s procedural rights under the EHA have been violated, an appropriate remedy must be provided. Despite Lynne's success in school, the fact remains that Bedford failed to follow the proper procedures and this omission affected her education. Although the harm that flowed from their failure to follow the regulations is difficult to assess, this difficulty partly arises from their omission. I agree with the hearing officer that Lynne C.'s "best interests may not have been served by Bedford." This disservice was partly due to their failure to follow the special education regulations, and not just that the Bedford graduation standards were lacking. On the other hand, Lynne and her mother requested these services late in her education and refused help when it was offered. Accordingly, they too must bear some measure of responsibility for whatever harm occurred.

To rescind Lynne's diploma and award her special education services that were appropriate in 1986 would be a disruptive remedy that would only serve to derail further Lynne's post-graduate educational path. Moreover, I agree that Lynne's diploma was validly issued. Therefore, Lynne C.'s request that the diploma be rescinded and that the educational plan proposed by her evaluator be implemented is denied. Instead, I order Bedford to make available remedial educational services to Lynne C. equal in time and scope to what she would have been given in 1986 had the regulations been followed. Of course,

these services must recognize whatever Lynne C.'s post-graduate educational course has been over the past two years, and take into account her current needs. The Bedford parties should strive to comply with this order in the least disruptive way possible to Lynne's current educational placement or plans.

As to Lynne's request for monetary damages, I find that any damage sustained by Lynne C. was partially a result of her own rejection of the services offered. Moreover, I find that the remedial education offered will correct any damage that has been done. Her request for monetary damages is thus denied. I will defer ruling on the request for attorneys' fees pending submission of affidavits from plaintiffs' counsel and my further review in accordance with the guidelines set out in 20 U.S.C. § 1415(e)(4)(B), *et seq.*

For the foregoing reasons, the Bedford school parties are hereby ORDERED to submit to this Court a written proposal for providing special education services to Lynne C. as outlined above. If acceptable, that plan will be offered for approval to Lynne.

SO ORDERED.

## ON MOTION FOR EXTENSION OF TIME

■ The defendant, Lynne C., has moved for a further extension of time to file a motion for reconsideration of my Order of September 12, 1988. She alleges she has not had sufficient time to gather the material she would like to contribute to the plan submitted by the plaintiffs for remedial services or, as it stands now, to respond to the plan which the plaintiffs have submitted. She seeks an extension of time to file for reconsideration so that if the plan is not acceptable after review by her specialist, Dr. Eloise White, she will preserve her rights to file for reconsideration. In addition, she requests an order for a transcript of the 1986 BSEA hearings in which her needs were discussed at length so that the adequacy of Bedford's plan can be determined.

Bedford opposes the motion. They have submitted a remedial plan with their opposition. Apparently, the plan was developed by relying on the assessment that Dr. White performed in 1986. It is undisputed in the parties' motions that Lynne C. was unable to get her specialist's input before this new plan was developed but the plan does include a provision that "Instruction will be adjusted to Lynne's learning style and levels according to recommendation by ... Dr. White." On its face, the plan seems adequate in scope; it calls for 1 hour every school day of special skills tutoring by a person certified in moderate special needs. The tutoring would be aimed at detailed goals which are also set out and relate mostly to study skills: taking notes, organizing assignments, highlighting reading, etc. The services were to begin October 17 1988 and continue through the end of the first academic semester at Middlesex Community College.

Under these circumstances, there is no reason to grant the defendant's motion. The plan itself allows for review. and change by Dr. White so Lynne C. will not be prejudiced because Dr. White's input has been unavailable. The transcript of the BSEA hearing would only serve to document Lynne's needs in 1986, but she needs services that are appropriate to her at this time. While the plan is based on the 1986 assessment, it does allow for revision and Lynne may still have the same kind of special educational needs she had in 1986. The worse harm would be to postpone further the services to which she is entitled. She is currently enrolled in school and immediate support to her program is my paramount concern.

Accordingly, the motion for further extension of time is denied, and the request for order for transcript is denied. Although the proposed plan appears adequate, the defendants are allowed 10 days to submit comments on the plan before my final review.

### ON MOTION FOR FINAL JUDGMENT (AND EVIDENTIARY HEARING)

■ The task presently before the Court is to judge the adequacy of the reme-dial educational plan that the plaintiffs have offered the defendant pursuant to my *Memorandum and Order* of September 12, 1988, page 841. Plaintiffs move this Court to enter final judgement on the plan. Defendant, on the other hand, requests an evidentiary hearing to present testimony to establish that the plan is inadequate.

On September 12, 1988, I found that the plaintiffs had violated procedures under the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1415, and I ordered the plaintiffs to provide the defendant with "remedial educational services ... equal in time and scope to what she would have been given in 1986 had the regulations been followed." Plaintiffs submitted a plan and in my *Memorandum and Order* of October 25, 1988, page 853, I allowed the defendant 10 days to submit her comments on the proposed plan. Her comments point out the deficiencies of the plan as an Individual Educational Plan within the meaning of 603 C.M.R. 28:322. Since there is some confusion about the remedy that I ordered, I will further explain my order and consider plaintiff's plan with that standard in mind.

The remedy in this case was difficult to fashion. The Bedford School system clearly violated the procedures under the EHA but they offered Lynne C. the services she would have received if a plan had been properly developed and administered. Lynne C. refused those services. Nevertheless, I ordered the school to offer Lynne C. those services again. At the time of my order, she was enrolled in post-graduate education and in need of some educational support. My goal was to provide Lynne C. support services which were appropriate to her post-graduate situation. I did not intend that Bedford be required to develop a plan as it is defined in the regulations. I wanted them to offer her services "equivalent" to what she would have received if a plan had been developed.

Their proposed plan, considered in the light of Dr. White's findings about Lynne C.'s educational needs, seems adequate. It calls for one hour every school day of spe-

cial skills tutoring by someone certified in moderate special needs. The goals relate to organizing information and developing study skills; highlighting, studying with a dictionary and maintaining a master calendar.

I have considered Dr. White's comments on the plan. Besides the "procedural" deficiencies she points out (comments 1–15), her comments mostly call for a greater *quantity* of support services; small group classes, tutors with specific subject matter knowledge and greater reading/writing help. These things would certainly help Lynne C. but they exceed the parameters of the remedy I ordered. Lynne C. only applied for services in March, 1987 and she graduated in June, 1987. Dr. White's suggestions exceed the "equivalent" of what would have been offered.

I do, however, find one of Dr. White's suggestions which calls for some modification in the plan. At page 3 of the letter, Dr. White points out that Lynne not only has difficulty organizing her time and studies, she has difficulty learning, organizing and applying *concepts.* This is a critical difference. Within the existing framework of the plan—the one hour per day, one-on-one moderate special needs tutor—this need should be addressed. Moreover, as the plan states, the Bedford school system should remain open to the reasonable recommendations of Dr. White throughout the administration of these services.

Accordingly, defendants' motion for an evidentiary hearing is denied. Plaintiff should implement the plan, with the modification I outlined above, as soon as possible. The services should last for the equivalent of one school semester. Upon the submission of affidavits, I will consider the defendants request for attorney's fees pursuant to 20 U.S.C. § 1415(e)(4)(B), *et seq.*

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

This matter is before me on the various motions of both parties. Defendant Lynne C. moves for reconsideration of her motion for an evidentiary hearing, for a clarification of my order denying that motion and

for attorney's fees. Plaintiff Bedford opposes these motions, moves for attorney's fees and requests that any attorney fee liability I impose be shifted to the state defendants. I address first the motions for attorneys' fees. Plaintiff Bedford has requested approximately $25,300 under 42 U.S.C. § 1988 and the defendant, Lynne C., has requested $46,227.20 under the Handicapped Children's Protection Act, 20 U.S.C. § 1415.

### I.

First, Bedford's request. This Court has discretion to award attorney's fees to Bedford if it finds that Lynne's counterclaims were frivolous, unreasonable or without foundation, even if not brought in subjective bad faith. None of Lynne C.'s claims qualify in this respect. Her federal and state civil rights actions may have been ultimately unsuccessful but they were legitimate claims. They were related to defendant's procedural action under the Education of the Handicapped Act ("EHA") which was successful. Accordingly, Bedford's claims for attorney's fees are denied.

Bedford also seeks to shift the liability for any fees that might be allowed to the state defendants, because, it says, it was forced to defend itself in this Court as a result of the state maintaining an unlawful procedure for the review of hearing officers' decisions.

I see no basis in law for this request. Indeed, the policy underlying the awarding of fees under the EHA would be frustrated and contravened by such an award. This request to shift liability for fees to the state defendants is also denied.

### II.

Lynne C. brings her claims under the EHA, as amended by the Handicapped Children's Protection Act, 20 U.S.C. § 1415. That statute allows this Court to employ its discretion to award reasonable fees as part of the costs to the parents or guardian of a handicapped youth who is a prevailing party. The statute itself does not define "prevailing party" but the relevant Senate Re-

port states that it is the committee's intent that the terms "prevailing party" and "reasonable" be construed consistent with the Supreme Court's opinion in *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983). The House Conference Report does not discuss this point.

*Hensley* defines "prevailing party" as one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." 461 U.S. at 433, 103 S.Ct. at 1939. Bedford argues that Lynne C. did not achieve "some of the benefit" because Bedford offered her the same services that she was eventually awarded in my order. Even if the record could clearly establish that Bedford offered Lynne C. the exact services she would have received if the EHA had been followed, Lynne C. should not be penalized for rejecting the offer. Bedford's failure to follow the required procedures in effect, precluded her from knowing what services she deserved. In choosing to reject an offer and pursue litigation, she is not required to guess, at her own peril, what would have happened if Bedford had not violated the law. One of the objectives of the litigation was to have a court award her the services she was entitled to under the EHA and I ordered Bedford to provide the equivalent. On that basis, Lynne C. is a "prevailing party".

Even though Lynne C. is a prevailing party, she is not necessarily entitled to the full amount of attorney's fees requested. *Hensley* puts it this way:

"Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the

plaintiff achieved only limited success the district court should award only that amount of fees that is reasonable in relation to the results obtained."

461 U.S. at 440, 103 S.Ct. at 1943. Lynne C.'s civil rights claims overlapped considerably with her EHA claims, but she achieved only limited success. Therefore, she falls into the last *Hensley* category which requires that the extent of her success be considered in determining the amount of fees to be awarded. Because she only succeeded on the narrow EHA grounds, it would be appropriate to award a significantly reduced amount.

However, on the record as it now stands, I am not able to evaluate accurately the time spent on specific issues relating to the EHA claim and thereby to fairly award fees proportional to her limited success. Action on this motion is deferred pending further proceedings in this case.

### III.

■ Finally, Lynne C. has filed motions for reconsideration, clarification and for an evidentiary hearing. After hearing on February 6, 1989, I believe further submissions are necessary. Accordingly, the defendant's motion to reconsider is allowed and, in lieu of an evidentiary hearing, I will accept further submissions on the adequacy of Bedford's remedial education plan.

The purpose of the submissions will be to judge the adequacy of Bedford's plan as an award "equal in time and scope to what [Lynne C.] would have been given in 1986 had the regulations been followed." *Memorandum and Order*, 9/12/88, page 841. Accordingly, only evidence that pertains to the issues of (1) what Lynne C. should have received in 1986 under the EHA regulations and (2) whether the proposed plan is "equal in time and scope" to what she would have received, will be received.[1]

Following my review of those submissions, I will inform the parties whether an evidentiary hearing will be held.

SO ORDERED.

---

1. The submissions should include evaluations of Lynne C.'s functional abilities in 1986 under the regulations; what the regulations required in

1986 to meet those needs had they been followed; and the plans to meet her needs today.

## FINAL OPINION

This matter has undergone a long and tortuous course and, unfortunately, despite the efforts of all concerned, the sole purpose of the lawsuit—to provide the educational benefits Lynne C. should have received in 1986 under the Education of the Handicapped Act (EHA)—has not been achieved, and, indeed, is more problematical today than it was on May 22, 1987 when the complaint was filed. The entire background which leads us to the present status is set out in my previous memoranda and orders, dated September 12, 1988, October 25, 1988, December 22, 1988 and February 13, 1989. The responsibility for the unsettled posture of the case as it now exists must rest with me. Despite my clear intentions to put Lynne C.'s educational course back on track in September, 1988, I am constrained to say that objective has never been reached. In any event, this final memorandum and order will complete the record at this level.

### I.

Having reviewed the entire record,[1] I see no reason to alter my initial conclusions, and their supplementation as noted in my subsequent memoranda. Those conclusions can be summarized as follows:

1. Lynne C.'s procedural rights under the EHA were violated in 1986.

2. Despite this violation on the part of Bedford, Lynne C. refused help when it was finally offered to her.

3. Lynne C.'s diploma was validly issued in June, 1986.

4. Lynne C. was to receive remediable educational services equal in time and scope to what she would have been given in 1986 had the regulations been followed.

5. Bedford was to submit a written proposal for special education services.

6. The proposal plan submitted by Bedford was deemed adequate with one modification calling for a need to learn, organize and apply *concepts* in addition to organizing time and studies.

7. Bedford was ordered to implement the plan with the modification as outlined in No. 6 for a period of one school semester.

8. Counsel for Lynne C. was entitled to attorneys fees as a prevailing party under the EHA, proportional to her limited success.[2]

### II.

■ Lynne C. seeks total fees and costs of $50,716.22. The sole basis for concluding that Lynne C. was a "prevailing party" according to the test provided in *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) was her success in achieving the services to which she was entitled under the EHA. That success, however, was limited, first because she had been offered and refused a remedial post graduate program equivalent to, if not greater, than the program eventually ordered. Secondly, I am also mindful of the time and effort incurred by the plaintiffs, and the Court, in addressing the Section 1983 counterclaims which I believe had no basis in fact or law.

Having the foregoing in mind, I have reviewed the hours claimed and costs incurred. I believe counsel is entitled to reasonable fees and expenses incurred between the filing of the complaint to the issuance of my order of September 15, 1988. I calculate the expenses at $451.53 and they are awarded in full. I have calculated the hours spent by both Attorney Fray and Attorney Rothman. In that time period, Attorney Fray spent approximately

---

1. The record now contains the most recent submissions, as well as the Administrative Record, appendices and reports of the various experts who evaluated Lynne C. in the spring of 1986.

2. It was this order of February 13, 1989, which engendered confusion and leads us to the present unsettled posture of the case. No submissions were received by the Court. On February 22, 1990, over a year later, I called the matter for status conference, only to discover that Lynne C. was awaiting a notice from the Court as to the date for submissions and, if necessary, an evidentiary hearing. Wherever the responsibility falls, the record is now complete and the time has come to put this matter to rest at this level.

28.30 hours and Attorney Rothman spent 139.10 hours on this matter. I believe a reasonable hourly fee for Attorney Fray to be $150.00. I believe a reasonable hourly fee for Attorney Rothman to be $75.00, despite the fact that at one point her hourly fee was increased to $125.00 per hour. I believe these rates are reasonable in light of the nature of the pleadings, the repetitiveness of much of the material before the administrative boards and this Court, and the straightforwardness of the issue, namely, what was the best program for Lynne C.

In summary, fees and costs are awarded as follows:

| | |
|---|---|
| Attorney Fray: | $ 4,245.00 |
| Attorney Rothman: | 10,432.50 |
| Total Fees | $14,677.50 |
| Costs | 451.53 |
| Total Award: | $15,129.03 |

In accordance with the above, judgment will enter ordering Bedford to implement the "Educational Support Program" that was offered in October, 1987. The judgment will also enter ordering Bedford to pay attorneys' fees and costs in the amount of $15,129.03.

SO ORDERED.